We have five cases to be submitted today on oral argument. We will hear probably the first three and then take a short recess before finishing the docket. And we begin with United States v. Rao. Mr. Ortaway. Thank you, Your Honor, and may it please the Court. Brett Ortaway on behalf of Dr. Shachar Rao. We have raised three grounds on appeal and all merit this Court's attention, but I hope this morning to focus on our first ground relating to the sufficiency of the evidence, and our third ground pertaining to Dr. Rao's sentence. And I'd like to start with our sufficiency ground. The jury here got it right on count one. Dr. Rao is not guilty of conspiring to defraud the government by ordering unnecessary tests. But having found him not guilty of conspiracy, the jury then did something very curious. Apparently finding that he was running his own scheme within Eric Bugin's, the jury found him guilty of two substantive counts of health care fraud. And the jury did so despite the government's failure to introduce the order forms at issue in those two counts. And it is that failure that is really the basis for both of our arguments within ground one. The first argument is really just that simple. Because we don't have the order forms, we don't know that Dr. Rao's name was on them, be it his signature or his stamp. And indeed, the only evidence even suggesting that his name was. So the insufficiency goes to the submission of the claims or to his state of mind? To the submission of the claims. Okay. And didn't he have record that he had been paid for those visits? Excuse me? Didn't he keep a record of being paid for what he signed or what was submitted on his behalf through the stamp? He did. But these two tests at issue here were not included. I think those particular dates they weren't included. No, no, Your Honor. Those went to other dates. And you know, this this relates to J. J. Is that the patient? Yes. J. J. October 13 and 14. But he testified even he didn't ever meet Dr. Rao. Right. Yeah. And yet and I mean, nor did he have the conditions that he was of that was described. Is that correct? Right. And so if if Dr. Rao had actually ordered or authorized those tests, then that would be a real problem for him. But I thought there was just sort of broad evidence that throughout this period, Rao was the treating physician and he was being compensated despite not seeing patients. Well, I think that's exactly right, that there is broad evidence. And that's the problem for the government, because we're not talking about the conspiracy conviction. Right. They chose to prosecute him for these two specific tests that they don't have the order forms for. But that's sort of telling them how they have to prove it. I agree. You the jury could have disbelieved it, seeing the discontinuity. But it another way to look at it, that a conspiracy is that this was a highly particularized jury. It was able to discern acquitted because Bergen lied to your client through and through no overall conspiracy. But when it gets right down to this particular patient, he didn't even meet the guy, but he was the referring physician and he is being compensated. Well, but I guess that's where I have to push back. Yeah. My argument is that we don't know that he was the referring physician or that he was compensated for these two tests because we don't have the order forms. The tests are not included in that journal where he kept a record of the tests he was ordering. And that's where we get to this claims data, because that is the only evidence that suggests that Dr Rao had anything to do with these tests. And there's a few very important things understand about this claims data. The first is that you didn't keep track of what you paid him. Excuse me. Are you saying that you didn't keep track of what you paid him? Do you have any way of knowing whether or not he was paid for these two referrals? I don't think that the record reflects whether or not he was paid for these two tests. I know that it doesn't have any record that he was paid for these two tests. Two law questions. Um, you cite the case that you cite. The only one I saw in the principal brief for the insufficiency argument was Bellu. Do you recall that? Uh, yes, your honor. But that was a legal insufficiency case, correct? A legal, legal insufficiency. I believe so. Yes. Okay. So here you're, you're just saying there was no factual evidence to support these two 1347 convictions, right? That there's just a gap. So what's your best case similar where the government's chosen imperfectly. In other words, it's got a really circumstantial case. It's attenuated. You may convince the jury, but if you don't, what's your case that a circuit court's going to overturn that, that sort of attenuated circumstantial proof. Well, so as we said in the briefing, it's really difficult to find a case like this one where the government prosecutes someone for two tests that they don't have the order forms for, but they have 19 others. But you're not saying that the government's got to prove he personally submitted the claims you accept. No, but he has to have had something to do with them. I mean, he, in this case, the government's theory was that he was the one who actually signed or, uh, authorized the use of his stamp to submit them. The government has to approve at least that cockerel lab. Is this the date at point? Uh, did these October 13, 14 was the, was Bergen, is that his name? Bergen? You can, you can. Was he already using the stamp himself? Yes, he was. The stamp came around, um, in the summer of 2015 and he said, Rao, believe him or not. I mean, he's obviously the mastermind and he's now the government lead witness, but he says round knew that they had the stamp and he said, Rao's still getting the money for the time. They're stamping Rao's name. Yeah. And the problem with the money aspect of that is that, uh, this kind of goes to the timeline here. So it's not as if the stamp came in the mail and Dr. What Dr. Rao put his pen away forever. The stamp and the pen are going on at the exact same time. So there's no reason for Dr. Rao to think, why am I still getting checks in the mail when I haven't signed anything in months because he is still signing order forms. The stamp was, um, being used alongside of him. The whole point of the stamp was that bugan was unhappy paying Dr. Rao for each test. So he said, I'll just get a stamp with this guy's signature on it and then I can stamp as many as I like. Um, and I don't have to pay him for those. And that really is a good segue to the second argument within ground one, which is that even if, um, uh, this court does not agree with me and cock rolls claims data is enough to conclude that Dr. Rao, uh, authorized these tests or his name was on the tests at issue in counts three and four, uh, counts two and three rather. It doesn't matter because the government failed to prove that he knew that bugan was using his stamp in this manner. Uh, the government asked the point blank. Okay. So this is going to state of mind now. No, this is going to him not authorizing, um, not authorizing bugan to use his stamp in this manner. Um, I may have misspoke a moment ago, but what I, what I mean here is that the government's theory was that either Dr. Rao signed these order forms himself or along with bugan, he ordered this stamp and said, you know, have at it. And so what I'm saying is that the government ordered this stamp so that he could authorize all these tests in Dr. Rao's name. And Dr. Rao never said that that was permissible. Uh, and so he is not responsible for causing the submission of any tests that were stamped under his name. So, but, but bugan testified that Rao would go to his house and sign 100 or 200 forms in a single visit at the house. Yes, your honor. All right. I mean, how does, how, how, how does that fit with your theory that Rao wasn't really involved? Well, it is, my theory is not that Rao wasn't really involved. And, um, that again would be excellent evidence to support a conspiracy conviction, but we are focused here on these two tests and that's it because the jury found him not guilty of conspiracy. So I'm not really concerned that I don't think this court should be concerned with evidence that he authorized other tests, but it would, you know, it's going to be come up in your loss argument, but it, whether he's acquitted or not, it doesn't mean it's not relevant conduct. That's true. But I don't know that that goes to this efficiency. So you have a huge amount of uncharged conduct that the jury hears where he's, he is seeing hundreds of people or not seeing them. He's just signing that he didn't see that that could go to relevant conduct as to the charge. Two counts, couldn't it? Yes. And, and, and he was held responsible for the loss amount for every single test that, uh, that his name was on. Okay. So, um, your, um, your argument about the sentence, uh, that it should have been actual loss, but doesn't the, our Vargas case in bank say that it's intended loss? Where are you going with that issue? Are you just trying to preserve it or do you? Yeah, we're just trying to preserve that. We are hoping that the Supreme Court steps in on that issue soon. Um, uh, on the, sorry. No, no, keep answering. Yeah. We're hoping the Supreme Court is going to step in, but the loss, the guidelines are being amended in two weeks to do the opposite. Right. And how's the Supreme Court going to step in? Well, maybe they won't. Um, and I don't know if that will apply retroactively or not, but our, our intention in raising that ground was to preserve it in light of the circuit split on the issue. But the commentary is going to be part of the guideline. Now the intended loss, isn't it? Right. It will, it will now, but not at the time of Dr. Rouse trial. Okay. Um, that's your, that's your only argument on loss. No, that's not our only argument on loss. That's our first argument on loss. We have two arguments here, just like with our first ground. Um, and the second argument is that even if we care about the intended loss amount, as the guidelines will, will soon, um, be clear, um, that it doesn't matter because here Cockrell's bills, uh, Cockrell's claims are not indicative of, uh, uh, Dr. Rouse intended loss amount. Uh, we recognize that in the ordinary case, the billed amount is, um, a good starting point for the intended loss amount. But this case is not like the ordinary case or any of the cases that the government cited in its brief. Uh, the government, uh, pointed to three cases on this issue. Um, Usman from this court, Elliott from this court, and Iwala from the first circuit. And in all of those cases, yes, like this one, the, there was a gap in the evidence as to what exactly the defendant knew about what they, uh, or what, what the, um, reimbursement amount would be. But the difference is, is that in all of those cases, the defendants were the owners of these crooked businesses that were established to bilk the government out of as much money as possible. So in our case, the analogs would be Cockrell and ADAR, Bugin. Those are the analogs to the defendants in those cases. But the problem is, is that Cockrell and ADAR knew exactly how much they were gonna be paid because they had a written agreement with Tricare that specified that Tricare would pay their publicly available rates. And then Dr. Rouse is downstream even from that. So you have the ADAR and Cockrell knowing they're going to get roughly two and a half million dollars and Dr. Rouse getting paid $50 per signature. So it's just not clear to me how, how it makes any sense to hold Dr. Rouse responsible for intending the government to lose $13 million. He's just not like those defendants on two counts, excuse me, two counts, one patient. It is, it is a pretty right. He's being held responsible for $13 million of loss, but all he was convicted of is two days, one patient, right? And that gets to your question earlier. I think that they held him responsible for everything, even though he was only convicted on those two. It looks that way, but judge Lindsey was very careful to say, I am not holding him responsible for the full conspiracy. I'm only holding him responsible where his initials or his association connected to the claims. That's exactly right. Your Honor. And I've had many conversations with my client about this, that you were not held responsible for acquitted conduct because you were not held responsible for the conspiracies entire billings. You were held only responsible for the relevant conduct, everything that was authorized under your name. So, um, uh, and you accept that and he, okay, so you're not arguing this was, this loss calculation was based on acquitted conduct. No, I don't believe this loss calculation was because the first level argument is Vargas wrong legal. Second level argument is you presented rebuttal evidence to show that this overstated the loss or is the argument you presented rebuttal evidence to show that Rao himself knew Tri Cares billing was only for actual loss. It's the first that, that the evidence in this case is that try or excuse me, Adar and Cockrell knew exactly how much they were going to be paid and Rao was just an employee of them. And so to hold him responsible for the entire intended a loss amount, uh, it just does not make any sense and it doesn't accord with any of the precedent cited by the government. But you didn't offer rebuttal evidence that he knew about the billing method. No. And that's how this case is akin to the cases that the government cited that we don't know exactly what was going through dr Rao's mind, which is why my point is that this case is otherwise distinguishable. You don't know what he wasn't paid for when they use the stamp. Excuse me? You don't know. Rao doesn't know what he wasn't paid for when they would use the stamp and not tell him. Right. Yes, that's right. Um, um, and, and just in my limited time left, I want to very briefly talk about the, um, harm or the, uh, the plain error aspect here. So the government concedes that, uh, if under DeNovo review, an error here would be harmful. Uh, but the government contends that there's no plain error if this is not preserved because of Judge Lindsay's downward variance. And so I want to just emphasize a couple of things here. The first is that I think this court has been very clear that even when there's a downward variance, a guidelines error is typically going to satisfy Bronx three and four of plain error review. Uh, and this is, I believe, the typical case. Uh, Judge Lindsay reiterated the guidelines range just before announcing his sentence. And I think most importantly, we filed a motion for release pending appeal, making this argument, Judge Lindsay denied it in a very thorough thoughtful order. Uh, and he pushed back on this argument, not at all and said, you have me all wrong. If the guidelines range would have been lower, it still would have been 48 months. And I think his silence there, um, is really telling on this issue. Are there any more questions? You saved time for a bottle. Thank you. Thank you. Miss Allen. Thank you, Your Honor. Catherine Allen on behalf of the United States. I'd like to start with defendant Rouse sufficiency argument. It's a very narrow challenge, as he just explained to whether he caused the submission of the two fraudulent claims at issue here. And I would just like to start with the fact that the two claims that were submitted to try care list him as the referring provider. The natural inference from that is that he was, in fact, the referring provider route. Did you have those requisition forms? No, Your Honor. And the jury was well aware that the government was relying on circumstantial evidence that he was the one who signed the two requisition forms. The jury asked during deliberations, the jury asked the court that sorry, the jury sent a question to the court stating that it was looking through all of the documentary evidence and couldn't find the two forms for J. J. And the court instructed the jury that those two forms were not in evidence. So this very discerning journey jury was aware that it was relying on circumstantial evidence when it convicted him of those two counts. I didn't have the forms. I don't know, Your Honor. And but I think the question, you know, the legal question before this court is whether there's sufficient evidence viewing viewing it in the light most favorable to the verdict from which a rational jury could determine that Rau was guilty of the convicted offenses. We think that that standard is met here again. He challenges the reliability of the evidence that he was the referring provider on the actual claims that were submitted. But reliability is typically a question for the jury. And here there was additional evidence that further corroborated the reliability of those records. And that came in the form of Rau's own notebook in which he had previously ordered tests for J. J. as well as for other patients. And during the trial, the government investigator walked through certain instances in his notebook and lined them up with the claims data that was submitted to further corroborate the reliability of the fact that when Rau was listed as the referring provider, the jury could infer that he was, in fact, the referring provider. In addition to that, there are a couple other aspects of these claims that further make it reasonable for the jury to infer that he was the one who caused who ordered the tests at issue. He had previously ordered a number of tests for the same patient as reflected in his own notebook. These are the types of tests that he was being paid by Adar Group to order. And it was during the time period that he was being paid by Adar Group, including that he received a $9,000 payment about a week later and a $6,000 payment about a month after that. So viewing the evidence in the light most favorable to the government, we think that a rational jury could infer that he was the one who caused the submission of the claims at issue. So the patient testified? That's correct, Your Honor. Bugan testified? That's correct. And then did the investigator also testify as to what Dr. Rauh said to him right after he was approached? That's correct, Your Honor. And did Rauh say anything incriminating that supports convictions on these two substantive counts, as did Rauh admit to anything? Well, I think the part of that conversation that we've relied upon is the investigator asked him, the investigator testified that he asked Rauh, how were you signing these forms? And Rauh said, well, initially I was hand signing them at home, and then it switched to a stamp that ADAR group purchased. And this goes to Rauh's second argument on the sufficiency claim. And, you know, generally it seems that he's arguing that there wasn't sufficient evidence to determine that the stamp, that he knew or authorized the use of the stamp to order lab tests. And we think there was a lot of evidence that that's why the stamp was ordered. Bugan testified that... But Bugan did say the whole reason for the stamp was to now bilk Rauh, right? We don't want to pay him as much. He did, he did testify that he, that one of the reasons for getting the stamp was to not, not have to, not have to pay Rauh for everything. But just to look again, I mean, Rauh ordered the stamp with Bugan knowing, and then it went to Bugan. It was kept at the facility. There was testimony that Rauh initially was reluctant to get the stamp, but never asked for it back and got it anyway. And again, if you just look at the stamp itself, which is on a number of the forms that were admitted into evidence, uh, it, it, it was clearly the purpose of the stamp was to stamp his signature on these order forms. It says his signature MD, it has the physician symbol, and then it has the name of ADAR group right underneath it. It's really hard to imagine what other reason Bugan could have had to order that stamp with Rauh, if not for stamping these requisition forms. And again, if you step back... The submission of these two orders, false orders, what's the best evidence? Is it the, the healthcare center's own records that attach him to it? The, the best, yes, the best evidence is the claims themselves list him as the referring provider. Okay. And then the best scienter evidence pertaining to these two counts. So again, just to, um, before I get into the details, I would just point out that he's not challenging the mens rea. He's not challenging that he didn't have an intent to defraud. He's making an actus reus argument that he never authorized the use of his stamp. So therefore couldn't have caused it. Well, he didn't bring up in oral argument, but his, the whole second issue went to his state of mind. Correct? That's not how I read his brief, Your Honor. Um, the, the headings, everything, it's all under the rubric of whether he caused the submission of the form. No, I mean the second issue in terms of Judge Lindsey saying government, you're not, I mean, in Mr. Rao, you're not going to be able to elicit cross-examination from Bugen as to whether in fact, not only was he lying to him, but he was actually telling him he talked to a lawyer and it was all legit. Sorry. Uh, yes, Your Honor. On the, on the second issue, the, the evidentiary issue, we do think that, um, even if there were plain error here, which we, we, we don't think that there's a clear obvious error here. Um, and if it's not waived that it's also, he has not established that it had a substantial effect on his rights because there was an abundant evidence of his intent to defraud Tricare. And if you just start at the very beginning, he responded to an online advertisement seeking a, uh, a contract physician to quote simply sign off on tests. That's how this all started. And then at the beginning, he's sitting down in Bugen's home signing hundreds of tests and all he's looking at is the Tricare insurance card or the, the military ID card that has the Tricare insurance number matching that up with the, uh, the name on the specimen and then signing the forms. And again, he was abundantly aware that his signature was needed for the, for the forms to be, sorry, for the claims to be reimbursed. And that's both through an email from Bugen in which Bugen specifically said that and. There were four doctors all total. That's correct. Did any of the others testify? No. Uh, but his co-defendant was Dr. Paramaswara and he pled guilty. And that that was the jury did or didn't know that. There was some discussion of that. I don't, I unfortunately don't remember the details of what the jury knew, but again, just going back to the, um, the, the evidence of intent. I mean, from the very beginning, he knew that what he was, that these tests were not medically necessary and that was carried throughout the whole scheme. And, you know, at some point they switched over to streamline the proceedings so that he wouldn't be sitting down and signing hundreds of these forms at a time, but instead they would be stamping them. If there are no further questions on the sufficiency, then I'll turn to the, um, to the, uh, to the loss argument that Rao brought up. Again, here, we think that this court should review, uh, review this argument for a plain error because it was very clear in the proceedings below that this argument was being raised as the basis for a variance. He didn't, he did not challenge the loss amount in the PSR. It was only in his motion arguing for a variance. And at the hearing with the court, uh, the council specifically said, I keep saying variance argument and the government says irrelevant under the guidelines. This is not a response to what I am saying. So it, the Rao was making clear at the hearing that he was not contesting the amount of loss, but instead was arguing for a variance because of the wide gap between the intended loss and the actual loss. But we think, so we think plain error review should apply even if it, it doesn't. Uh, we don't think that there's any clearly erroneous factual finding here. The district court used the amount that was billed to TRICARE, uh, for the relevant conduct and Rao didn't present, uh, evidence to re, to rebut that. There's no, um, clearly erroneous factual finding by the district court in relying on the prima facie amount. And I just wanted to mention one last thing. Um, uh, that, I mean, if I remember Judge Lindsey was really painstaking to try to explain whether he was or wasn't basing his loss calculation on acquitted conduct. That's correct. That sounds like he's pretty zeroed in on this being a calculation issue, not a variance issue. Well, sorry, Your Honor, I think that was a, you know, a different argument. I mean, he argued that there was no, that it shouldn't be based on acquitted conduct. And as you noted, Judge Lindsey very carefully went through that argument and rejected it. And I think it's telling that Judge Lint that that opinion does not address the amount argument that counsel is now making because the 13 million, you agree, of course, that 13 million is not even remotely tied to the I agree, Your Honor, that the 13 million is based on the relevant conduct. And you're saying the relevant conduct didn't include any of the acquitted conduct? Well, Your Honor, again, I don't, I don't think he's making an acquitted conduct here. I'm sorry if I've confused. Well, this indulge me because I, I very much, you know, this is a $13 million enhancement based on one patient. So whether it was a variance issue or whether it was an overstatement or whether it's acquitted, I'd just like to understand the government saying the loss amount was particularized to relevant conduct, but not acquitted conduct. That's correct, Your Honor. And it's the course of conduct in which he was doing the same, engaging in the same conduct that he did in the two counts of conviction, which was signing the requisition forms, authorizing the requisition forms with his stamp. And that's the same conduct that he's being held liable for in terms of the acquitted conduct. You heard me asking opposing counsel because, because the guidelines in a couple of weeks are being amended. And is it your understanding that acquitted conduct can no longer be relevant conduct? That is my understanding. It's not. So if it were acquitted conduct that at least in a few weeks would not be permissible, correct? To enhance based on acquitted conduct, whether it's relevant or not, that's just not going to be allowed. That's correct for a future case. Right. That amendment has not. That's why I'm asking is the sentence here predicated on something that in a couple of weeks he would not be going to jail for that amount of time? No, I don't think so, Your Honor. Again, the, he was acquitted of conspiracy and one could find that he didn't engage in conspiracy because there was no agreement, but that he still engaged in many, many instances of healthcare fraud. And he's, I think this is what Judge Lindsay's opinion gets at is that he's being held accountable for all of the different instances in which he committed the same course of conduct that he did in the two counts of conviction. And also just on the conspiracy conviction, I would like to just point out, sorry, the conspiracy acquittal. In the reply brief, and I think at argument today, counsel has sometimes suggested that the fact that he was acquitted means that he did not engage in the conspiracy. And I just want to make clear that it's, that under Supreme Court case law and this court's case law, that's not what an acquittal means. The jury could have found that he did engage in the conspiracy, but acquitted for reasons of compromise, lenity, mistake. And this court has specifically said in numerous cases, including United States versus parks, which is 68 F third eight 60 that quote, a not guilty verdict on one count does not establish any facts favorable to the defense for the purpose of determining the sufficiency of the evidence on the counts of conviction. So again, I don't think there's any inference that can be made, um, from the fact that he was acquitted on count one. And again, the legal question is just whether there was sufficient evidence viewing the light and the most favorable to the government to convict him on counts two and three. And for the reasons discussed, uh, we, we, we think that there was. And lastly, if there, if there are any questions, I'm happy to answer any questions that the court has about the, the evidentiary advice of counsel issue. We think that, um, you know, there, he has not shown a plain error. And as I noted before, or a substantial effect on his rights. And so we think that, uh, that all the conviction incidents should be affirmed here. All right. Thank you, Ms. Allen. Thank you, Mr. Orderway for rebuttal. Thank you, Your Honor. May it please the court? Um, just a few points here. Um, the government is right that our sufficiency arguments do not go to Dr. Rouse, a state of mind. It's about that actus Reyes about him causing the submission of these tests. And that is in large part because of the exclusion of the evidence that we talked about in ground two. But on the subject of going back to the subject of the stamp, I want to highlight just a few things. So the first is that this meeting that Dr. Rao had with federal agents, um, as we highlight in our brief is nearly two years after these tests were ordered. It is after ADAR has been raided by federal agents. It is after Bugen has been indicted. So what Dr. Rao knew then in the fall of 2017 does not show that he authorized or knew that his stamp was being used to order tests in the fall of 2015. The second thing I want to emphasize here is that the government has emphasized that Dr. Rao did not ask for his stamp back when he moved on to a real job. This is one of those facts that I don't really understand why the government emphasizes it because to me it supports what I'm saying that Dr. Rao did not know what Bugen was doing with his stamp. If Dr. Rao had negotiated to be paid per test, why would he leave ADAR and say, hold on to the stamp, keep authorizing as many tests as you like? It doesn't make any sense. And it reminds me of his disgust upon seeing the Killeen Clinic. The government cites that as evidence that he is guilty. But to me it shows that he did not realize what was going on, that he had been taken advantage of by Bugen, as we say, time and time again. On the subject of the stamp, additionally, the government asked Bugen point blank at trial, how did he know that Dr. Rao knew what he was using the stamp for? And his immediate reaction was, I don't know how I would know. He then came up with those other explanations that he was being paid, that he had access to this portal, but we don't really know that he accessed the portal, and actually Dr. Rao wasn't even checking the results, Bugen testified to. So neither of those backup reasons that he imagined on the stand are any good. It's that first response of his that I think is really telling. I don't know how I would know what Dr. Rao knew. And then finally, Your Honor, on ground three, on the loss amount issue, we recognize that the objection here wasn't as precise as it could have been. Trial counsel could have been more specific about this going to the loss amount for the guidelines calculation, but I think this court has been clear that exacting precision is not required, and they did submit the expert declaration is, quote, context that should help the court reach a reasonable loss calculation. And so I think that that is good enough to preserve the issue, but again, I don't think it matters. I think that even under plain error review, we can satisfy prongs three and four because Judge Lindsey's variance was so clearly tethered to that initial guidelines calculation. Oh, two quick questions. When you say the issue on loss, you're saying clear error what? Excuse me? The loss argument you're making, since it was imprecise to Judge Lindsey, to us, be as precise as possible. It's a legal argument or an evidentiary argument? Well, I suppose it's both, Your Honor. I mean, the argument— That sounds as imprecise as it was to Lindsey. Are you saying it's clear error for him to have assigned that amount of loss, $13 million? Yes. We are saying it's plain error for Judge Lindsey to have concluded that Dr. Rao intended a loss amount of $13 million. Because the facts—you presented facts that rebutted the PSR on that? Well, because all of the facts at trial—well, I guess, let me step back and say, I mean, the evidence at trial was that ADAR and Cockrell knew that they were not going to be paid $13 million. They knew that they were going to get $2.5 million for Dr. Rao's tests. Dr. Rao is, again, downstream from that. But don't you have to, under the case law, then show at sentencing evidence that Rao knew they knew they wouldn't be paid? Well, I don't think so. And that goes to those cases that the government cited, Usman, Elliott, and Iwala, where in those cases, like here, the defendants, we don't know what they knew. But again, they were the crooked business owners. It's not—they were not employees the way Dr. Rao was. Last with 20 seconds left. Since you did present the second issue, you've just referred to it. In 20 seconds, tell me exactly when did you object and what was the proffer of evidence that would have come in? So that was pre-trial. The government sought to head off Dr. Rao from questioning Bugin about his assurances. Who proffered that Bugin—you would elicit from him on cross what? That Bugin would say that he told Dr. Rao, I had all this vetted by an attorney. It's good. Do you have any good faith case that says good faith can come from a third party's inquiry to a lawyer? We don't have any case that says exactly that. We have cases that say that a good faith defense is not confined to direct advice of counsel. Thank you. All right. Thank you, Mr. Hortowicz. Case is under submission. Next case, United States v. Averill.